## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



**FILED**

Dec 31 2019, 8:53 am

**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Timothy J. Burns
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Matthew B. MacKenzie
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

Carlos Martin Uc,

*Appellant-Defendant,*

v.

State of Indiana,

*Appellee-Plaintiff.*

December 31, 2019

Court of Appeals Case No.
19A-CR-1133

Appeal from the Marion Superior Court

The Honorable Lisa F. Borges, Judge

Trial Court Cause No.
49G04-1808-F3-28648

**Bailey, Judge.**

# Case Summary

Carlos Martin Uc ("Uc") appeals his conviction of Battery, as a Level 5 felony.[1] We affirm.

# Issues

Uc presents two issues for review:

I. Whether there is sufficient evidence to support his conviction; and

II. Whether the trial court's response to a juror's concern over the translation provided by the victim's interpreter denied Uc due process.

# Facts and Procedural History

On July 28, 2018, Mario Mejia ("Mejia") and his wife, Sarah Mejia ("Sarah"), were leaving a friend's Indianapolis home after a visit when Selene Balan ("Balan") approached the couple's truck and asked Sarah for a ride. Mejia insisted that his wife should not give a ride to "basura" or "trash." (Tr. Vol. II, pg. 111.) Balan began striking Mejia. He displayed a small roofing knife and Balan backed away. After the altercation, Sarah gave Balan a ride home and

---

[1] Ind. Code § 35-42-2-1(g)(1). He was also adjudicated a habitual offender, based upon his admission. *See* I.C. § 35-50-2-8.

Sarah heard Balan making a telephone call to complain that Mejia had pulled a knife on her.

[4] The next evening, Mejia and Sarah were attending a neighborhood cookout when Sarah saw Balan arrive in a vehicle, accompanied by Uc and Uc's brother, Luis Nick ("Nick"). Balan singled out Mejia, saying "that's him, go beat him up." *Id.* at 138. Nick hit Mejia repeatedly and he fell to the ground. When Nick "stopped to catch his breath," Uc "came from the car and started stomping on [Mejia]'s stomach with full force." *Id.* at 119. Balan yelled "that's enough" and the trio fled. *Id.*

[5] Mejia was treated at a nearby hospital and released. His pain persisted for a few days and he returned to the hospital, where it was discovered that he had internal bleeding and a ruptured intestine. Mejia underwent surgery to remove several inches of his intestines.

[6] On August 28, 2018, the State charged Uc with Battery, as a Level 3 felony. On February 27, 2019, the State filed an additional charge of Battery Resulting in Serious Bodily Injury, a Level 5 felony. On March 1, 2019, the State alleged that Uc is a habitual offender. On March 4, 2019, the charge of Battery, as a Level 3 felony, was dismissed and Uc was brought to trial before a jury on the Level 5 felony charge. He was convicted and admitted his status as a habitual offender. On April 24, 2019, Uc was sentenced to an aggregate term of ten years imprisonment. He now appeals.

# Discussion and Decision

## Sufficiency of the Evidence

[7] To convict Uc of Battery, as a Level 5 felony, as charged, the State was required to establish beyond a reasonable doubt that Uc knowingly or intentionally touched Mejia in a rude, angry, or insolent manner, by hitting or kicking Mejia, resulting in serious bodily injury[2] to Mejia, or that Uc knowingly aided, induced, or caused another person to commit that offense. I.C. §§ 35-42-2-1, 35-41-2-4. Uc concedes that Mejia suffered serious bodily injury from a beating but claims that there is insufficient evidence of his identity as one of the perpetrators.

[8] Our standard of review for sufficiency claims is well settled; we do not reweigh evidence or assess the credibility of witnesses. *Gray v. State*, 903 N.E.2d 940, 943 (Ind. 2009). Rather, we look to the evidence and reasonable inferences drawn therefrom that support the judgment and we will affirm the conviction if there is probative evidence from which a reasonable factfinder could have found the defendant guilty beyond a reasonable doubt. *Id.*

[9] Uc concedes that the State presented identification evidence but argues that "the identification of [Uc] as being the perpetrator of this action is confusing

---

[2] Pursuant to Indiana Code Section 35-31.5-2-292, "serious bodily injury" is a bodily injury that creates a substantial risk of death or causes serious permanent disfigurement, unconsciousness, extreme pain, permanent or protracted loss or impairment of the function of a bodily member or organ, or loss of a fetus.

and contradictory." Appellant's Brief at 9. He points to Mejia's testimony in which he alternately refers to his second attacker as either "Oscar" or "Carlos" and to Mejia's admission that he became intoxicated at the cookout. Sarah testified that she did not drink alcohol, and she saw Uc drive up to the cookout in his vehicle with his brother and Balan as passengers. Sarah also testified that she saw Uc stomp on Mejia "with full effect." (Tr. Vol. II, pg. 119.) The State elicited testimony that both Sarah and Mejia had selected Uc's photograph from a photo array prepared by Indianapolis Metropolitan Police. Sarah made an in-court identification of Uc as one of the perpetrators of the attack. Uc is simply asking that we re-assess the credibility of witnesses and discard all identification evidence favorable to the verdict. This we cannot do. *Gray*, 903 N.E.2d at 943. Sufficient evidence supports Uc's conviction.

## Due Process

[10] At the outset of the second day of trial, the trial court advised the parties:

> One of the jurors has indicated to my bailiff that a – one of the other jurors is a Spanish speaker. The juror who's a Spanish speaker has told the rest of the panel that the court's interpreter did not interpret word for word, the testimony that was presented. Now we all know that interpreters do not interpret word for word, they interpret meaning, right. Nonetheless, the panel's been given this information from someone who speaks Spanish and so I would ask the parties for your input.

(Tr. Vol. II, pg. 193.) Defense counsel asked that the juror who had spoken with the bailiff be called into court and interviewed; the trial court ceded to the

request. Juror No. 6 clarified that the Spanish-speaking juror did not appear to be attacking the competency of the interpreter; rather, the other juror had indicated that "a few things were spoken differently" and she had been "thrown off" by the reference to "Oscar." *Id.* at 196. At bottom, the concern centered around whether Mejia had been using a "nickname" for his attacker and Juror No. 6 appeared to believe that the concept of use of nicknames in general could have been better clarified.

[11] When the juror interview concluded, the State asked for an admonishment to advise the jury that the role of a certified interpreter is to interpret the meaning of language used, but he or she does not necessarily translate language verbatim. Defense counsel responded: "I think that's sufficient as well." *Id.* at 198. The trial court then admonished the jury:

> It's come to my attention that one of you is a fluent Spanish speaker. I want to talk about briefly the court's interpreter that was presented during – that helped present testimony yesterday. The court's interpreter was – is a certified interpreter and their goal as an interpreter is to interpret the meaning of a sentence, not necessarily word for word what was said. So given that, there may have been some differences in the word used by the witness and the word presented in the sentence by the court's interpreter. However, the meaning should have been the same, all right.

*Id.* at 199. In closing, defense counsel argued that Mejia's confusing testimony had created reasonable doubt. He also criticized the State for its failure to call a witness to clarify any discrepancy between a given name and a nickname. The

trial court admonished defense counsel that he could not use closing argument to allege bad faith on the part of the State in its selection of witnesses.

[12] On appeal, Uc concedes that his counsel agreed to the procedure employed. To circumvent the waiver doctrine, he advances a claim of fundamental error. Fundamental error is "a clearly blatant violation of basic and elementary principles, and the harm or potential for harm therefrom must be substantial and apparent." *James v. State*, 613 N.E.2d 15, 25 (Ind. 1993). According to Uc, "the interpreter should have been examined to ensure the testimony was being accurately reported." Appellant's Brief at 14. He makes a cursory allegation that the trial court's failure to do so, coupled with the restriction on defense closing argument, "denied [him] due process of law." *Id.* at 15.

[13] Generally, a party's failure to object to an alleged error at trial results in waiver. *Durden v. State*, 99 N.E.3d 645, 651 (Ind. 2018). When a passive lack of objection is coupled with a counsel's active requests, "it becomes a question of invited error." *Brewington v. State*, 7 N.E.3d 946, 974 (Ind. 2014). Pursuant to the invited error doctrine, which is grounded in estoppel, a party is not permitted to take advantage of an error that he or she commits, invites, or which is the natural consequence of her own neglect or misconduct. *Id.* at 975. Invited error "precludes relief from counsel's strategic decisions gone awry." *Id.*

[14] Whereas waiver generally leaves open an appellant's claim to fundamental-error review, invited error typically forecloses appellate review. *Batchelor v.*

*State*, 119 N.E.3d 550, 556 (Ind. 2019) (citing *Brewington*, 7 N.E.3d at 974-75). But more than mere neglect to lodge an objection is required to foreclose appellate review; that is, to establish invited error, there must be some evidence that the error resulted from the appellant's affirmative actions as part of a deliberate, "well-informed" trial strategy. *Id.* at 558 (citing *Brewington*, 7 N.E.3d at 954).

[15] Uc requested in-court examination of Juror No. 6. At the conclusion of that juror interview, Uc affirmatively agreed that an admonishment concerning an interpreter's role was the appropriate procedure. He then argued in closing that confusion surrounded Mejia's identification testimony and thus there was reasonable doubt that Uc was Mejia's attacker. In sum, Uc actively requested the trial court's response and any error in prematurely terminating the investigation is invited error, which we do not address.

# Conclusion

[16] Sufficient evidence supports Uc's conviction. He has not shown a deprivation of due process.

[17] Affirmed.

Kirsch, J., and Mathias, J., concur.